IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BIGLER JOBE STOUFFER, II, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-07-1312-C |
| | ) | |
| RANDALL G. WORKMAN, Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent.[1] | ) | |

## **MEMORANDUM OPINION**

Petitioner, a state court prisoner currently incarcerated pending the execution of a judgment and sentence of death, has filed a *Petition for a Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254* (hereinafter "Petition").  (Dkt. No. 31.) Petitioner, appearing with counsel, challenges the judgment and sentence entered against him in Oklahoma County District Court Case No. CF-85-509.  Respondent has responded to the Petition and Petitioner has replied to this response.  (Dkt. Nos. 50, 53.)  The state court record has been supplied.[2]

---

[1] When this action was commenced, Marty Sirmons was the warden of the Oklahoma State Penitentiary and the properly named Respondent.  Randall G. Workman is the current warden of the Oklahoma State Penitentiary and the state officer having present custody of Petitioner.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Workman should be substituted for Mr. Sirmons as the proper party Respondent.  See also Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

[2] References to the parties' pleadings shall be as follows:  Petitioner's Petition shall be cited as (Pet. at __); Petitioner's Exhibits to his Petition as contained in his Appendix shall be cited as

## I.     PROCEDURAL HISTORY

Petitioner's judgment and sentence is the result of his second trial for the murder of Linda Reaves and shooting of Doug Ivens.  After his first trial and unsuccessful challenges to his convictions and sentences in state court, Petitioner sought and obtained federal habeas corpus relief.  In Stouffer v. Reynolds, 168 F.3d 1155, 1158 (10th Cir. 1999), the Tenth Circuit vacated this Court's denial of habeas relief and remanded for an evidentiary hearing on the merits of Petitioner's claim of ineffective assistance of trial counsel.  The Tenth Circuit subsequently affirmed this Court's conditional grant of habeas relief in Stouffer v. Reynolds, 214 F.3d 1231, 1235 (10th Cir. 2000).  Petitioner was then retried in Oklahoma County District Court from January 13 through February 7, 2003.  The jury convicted Petitioner of shooting with intent to kill and first degree murder.  The jury also found that (1) Petitioner knowingly created a risk of death to more than one person; and (2) the killing was committed for the purpose of preventing a lawful arrest or prosecution.  The jury set Petitioner's sentence for first degree murder at death and 100 years for shooting with intent to kill.  (O.R. X, 1925-26.)  Petitioner appealed to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA").  Stouffer v. State, 2006 OK CR 46, 147 P.3d 245.  The OCCA denied relief and affirmed Petitioner's judgment and sentence.  Id. ¶ 212, 147 P.3d at 281.  The

---

(Pet'r's Ex. __); Respondent's Response to Petition for Writ of Habeas Corpus shall be cited as (Resp. at __); and Petitioner's Reply to Respondent's Response shall be cited as (Reply at __).

References to the record shall be as follows:  The trial court's original record shall be cited as O.R. __, __); the first stage trial transcript shall be cited as (Tr. __, __); the second stage trial transcript shall be cited as (2nd Stage Tr. __, __); and motions hearing transcripts shall be cited as (M. Tr. __/__/__, __).

Supreme Court denied certiorari.  Stouffer v. Oklahoma, 549 U.S. 1352 (2007).  The OCCA

denied Petitioner's Application for Post Conviction Relief in an unpublished order dated

October 26, 2007.  Stouffer v. Oklahoma, No. PCD-2003-835 (Okla. Crim. App. Oct. 26,

2007).  Petitioner subsequently filed his Petition in this Court on September 8, 2008.

## II.    FACTUAL BACKGROUND

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when

a federal district court addresses "an application for a writ of habeas corpus by a person in

custody pursuant to the judgment of a State court, a determination of a factual issue made by

a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  For the purposes of

consideration of the present Petition, the Court provides and relies upon the following

synopsis from the OCCA's opinion summarizing the evidence presented at Petitioner's trial.

Following a review of the record, trial transcripts, and the admitted exhibits, the Court finds

the OCCA's summary adequate and accurate.  The Court therefore adopts the following

summary as its own:

> Doug Ivens and Velva Ivens (now Pardee) were separated and pursuing
> divorce proceedings.  [Petitioner] was dating Velva.  Doug Ivens was dating
> Linda Reaves.
>
> Doug Ivens testified that on January 24, 1985, [Petitioner] came to his
> house asking for a pistol.  [Petitioner] told him that he needed a gun because
> there were prowlers or a burglar at Velva Ivens's house.  Doug Ivens was
> concerned for the safety of his estranged wife and his two eight-year-old
> daughters.
>
> Doug Ivens went to his bedroom and came out with a bank bag
> containing a loaded Colt .357 caliber revolver.  Doug gave the bank bag to
> [Petitioner].  [Petitioner] turned his back to Doug Ivens, and then he turned

around with the pistol in his hand.  [Petitioner] fired two shots at Ivens, and Ivens fell to the floor.  [Petitioner] then went to where Linda Reaves was reclining on the couch and shot her twice in the head.  [Petitioner] walked back to Ivens and fired another shot into Ivens's face.  [Petitioner] then left.

Ivens was able to crawl to the phone and call the police.  He told police that [Petitioner] had shot him and Linda Reaves.  Reaves died as a result of her gunshot wounds, but Doug Ivens survived.

Stouffer, 2006 OK CR 46, ¶¶ 3-6, 147 P.3d at 256.  Additional relevant facts from the record are provided where necessary.

## III.   PETITIONER'S CLAIMS FOR RELIEF

### A.   GENERAL CONSIDERATIONS:  Exhaustion and Procedural Bar

Federal habeas corpus relief is unavailable to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition.  28 U.S.C. § 2254(b); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994).  In every habeas case, the Court must first consider exhaustion.  Harris, 15 F.3d at 1554.  "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991).  Generally, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal. Rose v. Lundy, 455 U.S. 509, 519 (1982); Fairchild v. Workman, 579 F.3d 1134, 1156 (10th Cir. 2009).  Under the AEDPA, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2554(b)(2).

4

### B.     THE STANDARD OF REVIEW

Under the AEDPA, in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

"A state-court decision is contrary to clearly established federal law if: (a) the state court applies a rule that contradicts the governing law set forth in Supreme Court cases; or (b) the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent."

Fairchild, 579 F.3d at 1139 (internal quotation marks and citations omitted); see also Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court).  A state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Williams, 529 U.S. at 407.  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's]

decisions as of the time of the relevant state-court decision." <u>Id.</u> at 412.  Relief is warranted

only "where there is no possibility fairminded jurists could disagree that the state court's

decision conflicts with [the Supreme Court's] precedents." <u>Harrington v. Richter</u>, 562 U.S.

___, ___, 131 S. Ct. 770, 786 (2011).

### C.    GROUNDS FOR RELIEF

### 1.    Ground One:  Juror Misconduct

In his first ground for relief, Petitioner argues three jurors misrepresented their prior

experiences with the judicial system and therefore deprived him of a fundamentally fair trial.

(Pet. at 14-28.)  Respondent argues the claim is procedurally barred.  (Resp. at 7-16.)

Petitioner first raised this claim on post-conviction review and the OCCA denied relief.

<u>Stouffer</u>, No. PCD-2003-835, slip. op. at 2-5.  In his Application for Post Conviction Relief,

Petitioner argued his appellate counsel's ineffectiveness excused the failure to present the

claim of juror misconduct on direct appeal.  Application for Post Conviction Relief, Case No.

PCD-2003-835, pp. 10-11.  The OCCA determined that Petitioner failed to demonstrate any

jury bias, "impliedly or otherwise."  <u>Stouffer</u>, No. PCD-2003-835, slip. op. at 4. Further, the

state court concluded that Petitioner did not "show that the jurors' answers concealed

material information which would have indicated bias."  <u>Id.</u>  In sum, the OCCA concluded

Petitioner failed to demonstrate prejudice necessary to establish ineffective assistance of

appellate counsel which would excuse the procedural bar.  <u>Id.</u> at 5.

A federal habeas court "does not address issues that have been defaulted in state court

on an independent and adequate state procedural ground, unless the petitioner can

demonstrate cause and prejudice or a fundamental miscarriage of justice." English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998); see also Coleman, 501 U.S. at 750; Anderson v. Sirmons, 476 F.3d 1131, 1140 (10th Cir. 2007). Petitioner does not challenge the independence or adequacy of Oklahoma's procedural bar. Nor does Petitioner argue that failure to consider the claim will result in a fundamental miscarriage of justice. See Demarest v. Price, 130 F.3d 922, 941 (10th Cir. 1997) (fundamental miscarriage of justice requires "a colorable showing of factual innocence.").

To escape application of the bar, Petitioner asserts, as he did in state court, that the ineffectiveness of his counsel on direct appeal excuses his procedural default. "[C]ause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Coleman, 501 U.S. at 753. Procedural default may be excused if it occurs as the result of ineffective assistance of counsel. Carrier, 477 U.S. at 488. Claims of ineffective assistance of appellate counsel are reviewed under the Strickland[3] standard. Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003). To succeed, Petitioner must show both "(1) constitutionally deficient performance, by demonstrating that his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding – in this case the appeal –

---

[3] See Strickland v. Washington, 466 U.S. 668, 686 (1984).

would have been different."  Id.  Counsel need not demonstrate the omitted claim was a "dead-bang winner" but must establish a "reasonable possibility that the omitted claim would have resulted in a reversal on appeal."  Neill v. Gibson, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).[4]

A successful claim of juror misconduct based on misrepresentations made during voir dire requires a showing that (1) a juror failed to answer honestly a material question on voir dire; and (2) a correct answer would have provided a valid basis for a challenge for cause. McDonough Power Equip., Inc., v. Greenwood, 464 U.S. 548, 556 (1984).  See also Gonzales v. Thomas, 99 F.3d 978, 984 (10th Cir. 1996); Burton v. Johnson, 948 F.2d 1150, 1155 (10th Cir. 1991).  A "mistaken, though honest, response to a question" does not satisfy the first part of the McDonough inquiry; rather, the focus is on "intentionally incorrect responses."  Gonzales, 99 F.3d at 984 (quoting McDonough, 464 U.S. at 555).  Dishonesty alone during voir dire is insufficient to demonstrate bias.  Skaggs v. Otis Elevator Co. 164 F.3d 511, 517 (10th Cir. 1998).  A petitioner must show that a correct answer reflects a lack of impartiality on the part of the juror.  McDonough, 464 U.S. at 554.

---

[4] Petitioner asserts that the OCCA misapplied Strickland by requiring a demonstration that absent the jurors' misconduct, a different outcome would have occurred.  (Pet. at 26.)  See Stouffer, Case No. PCD-2003-835, slip op. at 4-5 ("[Petitioner] cannot show that absent the jurors' conduct, a different outcome would have occurred in his trial.").  Respondent submits that the OCCA merely used abbreviated language and applied the correct standard.  (Resp. at 12.)  The Court is not persuaded that the OCCA applied an incorrect standard.  As discussed below, Petitioner's claim ultimately fails because he is unable to demonstrate a "reasonable possibility that the omitted claim would have resulted in a reversal on appeal."  Neill, 278 F.3d at 1057 n.5.

In Burton, the Tenth Circuit applied the McDonough rule and affirmed the district court's grant of habeas relief for a petitioner convicted of first degree murder. Burton, 948 F.2d at 1159. Burton alleged she killed her husband as a result of "battered woman's syndrome" following the husband's repeated physical, sexual, and verbal assaults on her and her children. Id. at 1151. Burton sought individual and sequestered voir dire to permit inquiry into jurors' experiences with sexual and physical abuse. Id. at 1151-52. After the jury returned a guilty verdict, Burton submitted evidence that several jurors failed to disclose personal situations involving abuse. Id. at 1154. In particular, one juror stated that her husband had a violent temper and had physically and verbally abused her family. Id. At a post-trial hearing, the juror testified that she did not "connect" her own experience of abuse with that of the defendant. Id. On habeas review, the district court concluded that the juror failed to honestly answer a material question during voir dire, and that the correct answer which would have disclosed her history of abuse provided a valid basis for a challenge for cause. Id. at 1158. The district court also concluded the juror's personal experience created implied bias. Id. On appellate review, the Tenth Circuit affirmed, concluding that the juror's "failure to respond on *voir dire* denied Mrs. Burton a fair trial under the McDonough test, for it is clear that the juror did fail to answer a material question, and that a correct response would have provided a basis for a challenge for cause." Id. at 1159. The Tenth Circuit also found that the juror's dishonesty during voir dire was clear from the record and reasoned that "dishonesty, of itself, is evidence of bias." Id.

Subsequently, in Gonzales, the Tenth Circuit again applied McDonough on habeas review. Gonzales, 99 F.3d at 984-85. Gonzales was convicted in state court on charges of criminal sexual penetration and weapons charges relating to the rape. During voir dire, potential jurors were asked whether they or any member of their immediate family had been involved in a "similar type" of incident – sexual assault. Id. at 982. One juror later testified at an evidentiary hearing in federal court that she had been "date raped" many years ago and discussed her experience with other jurors during deliberation. Id. at 982. However, she considered her personal experience to be sufficiently distinct from that at trial, so she did not disclose it. Id. The district court adopted the magistrate judge's finding that the juror was not dishonest during voir dire because she genuinely believed her experience was distinct. Id. at 984. Based on this finding and reviewing for clear error, the Tenth Circuit concluded Gonzales failed to demonstrate the first prong of the McDonough test, failure to answer a material question honestly. Id. at 985. The Tenth Circuit also determined the juror was not actually or impliedly biased because of her personal experience. Id.

In this case, during voir dire, the trial court asked the jury panel, "[H]ave any of you ever appeared in a court of law, under any circumstances? Under any circumstances, either as a witness, a plaintiff or as a defendant?" (Tr. I, 131-32.) The prosecutor also asked the panel "if you, family member, friends, kin folk have been arrested, charged, investigated, prosecuted, whether you go to trial or not, end up in prison or anything else like that I need to know." (Tr. III, 34.) Petitioner draws attention to the responses of three jurors.

Prospective Juror Douglas disclosed that she had been a defendant in an assault and battery case and a witness in a civil case. (Tr. I, 135.) Upon questioning from the trial court, Ms. Douglas stated that her experience in the criminal matter would not cause any concern about her ability to be fair and impartial in Petitioner's trial. (Id.) Petitioner characterizes Ms. Douglas's responses as false and deceptive. In support, Petitioner attaches numerous exhibits purporting to detail Ms. Douglas's extensive experiences with the legal system.[5] According to Petitioner, Juror Vetter similarly failed to disclose a previous arrest and charge for assault and battery in Texas which was later dismissed. (Pet'r's Ex. 15.) Petitioner also claims prospective Juror Tharp failed to disclose a bankruptcy filing in 2001. (Pet'r's Ex. 16.)

The attached court records and affidavits raise the inference that each juror's response, and particularly that of Ms. Douglas, was not completely forthcoming during voir dire. However, the OCCA did not determine whether any of the three challenged jurors were dishonest in voir dire. Rather, the OCCA concluded the jurors did not fail to disclose material information that would have indicated bias. This conclusion is reasonable.

---

[5] The attached affidavits and records to Petitioner's Petition purport to show that Ms. Douglas (1) filed for a protective order (Pet'r's Ex. 1); (2) was a subject of a protective order (Pet'r's Ex. 2); (3) violated a protective order (Pet'r's Ex. 3); (4) was not a witness in the civil case disclosed during voir dire, but rather a plaintiff (Pet'r's Ex. 4); (5) petitioned for divorce (Pet'r's Ex. 5); (6) pled guilty to unlawful possession of marihuana and paraphernalia (Pet'r's Ex. 6); (7) again petitioned for divorce (Pet'r's Ex. 7); (8) filed a small claims action in Oklahoma County District Court (Pet'r's Ex. 8); (9) was a subject of a protective order (Pet'r's Ex. 9); (10) again petitioned for divorce (Pet'r's Ex. 10); (11) had a spouse who pled guilty to interstate transportation in aid of racketeering in federal court (Pet'r's Ex. 11); (12) was present at a location in which the Village Police Department assisted a federal agency in securing custody of a subject (Pet'r's Ex. 12); and (13) filed a temporary restraining order against former spouse (Pet'r's Ex. 13).

Assuming Petitioner's attachments accurately recount prior contacts each juror had with the justice system, the most Petitioner has established is that the jurors did not disclose prior contacts with the legal system.   Even if the Court were to conclude the responses were dishonest, dishonesty alone is insufficient to establish a due process violation under McDonough.   McDonough, 464 U.S. at 556; see also Skaggs, 164 F.3d at 517-18.

Importantly, Petitioner fails to demonstrate that had each juror disclosed the alleged contacts with the justice system, such disclosures would have provided a basis for a challenge for cause.   McDonough, 464 U.S. at 556.   Petitioner argues that, with Ms. Douglas specifically, such extensive contacts prevented her from being impartial and provided a valid basis for a challenge for cause because she would have preconceived notions about the justice system.  (Pet. at 22.)  Petitioner fails to cite authority for the proposition that a juror's prior contacts with the legal system necessarily render the juror impartial and provide a challenge for cause.   Petitioner asks this Court to conclude that the jurors' prior experiences constitute implied bias.  (Reply at 14.)   Implied bias is "reserved for those extreme and exceptional circumstances that leav[e] serious question whether the trial court . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice." Gonzales, 99 F.3d at 987 (internal quotations marks and citations omitted).  That prospective jurors may have omitted disclosures about their prior contacts within the legal system does not rise to the level of implied bias.   See id. (holding that implied bias is limited to those instances "'in which the circumstances point so sharply to bias in a particular juror that even

his own denials must be discounted'") (quoting United States v. Nell, 526 F.2d 1223, 1229 n.8 (5th Cir. 1976)).

Having failed to demonstrate the OCCA's determination that the jurors were not biased against Petitioner was unreasonable, Petitioner has not demonstrated a reasonable probability that the omitted claim of juror misconduct would have resulted in reversal on appeal. Neill, 278 F.3d at 1057 n.5. The Court need not determine whether appellate counsel's performance was constitutionally adequate under Strickland because Petitioner has failed to demonstrate the essential element of prejudice. Strickland, 466 U.S. at 687. As a result, Petitioner fails to demonstrate the cause necessary to excuse the procedural default of his claim. Therefore, the Court denies Petitioner relief on his first ground.

### 2.    Ground Two:  Removal of Prospective Jurors for Cause

In his second claim for relief, Petitioner argues the trial court's refusal to remove three jurors for cause deprived him of due process. (Pet. at 28-36.) Petitioner presented this claim on direct appeal and the OCCA denied relief on the merits. Stouffer, 2006 OK CR 46, ¶¶ 37-40, 147 P.3d at 260. Respondent submits that the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 16-24.)

The trial court denied Petitioner's motion to excuse Ms. Shetley, Ms. Vetter, and Mr. T. Knight. (Tr. III, 109-10, 113-14.) Petitioner argued Ms. Shetley was biased because of her personal connections with law enforcement and her views on the death penalty. During voir dire, Ms. Shetley disclosed that her husband was a police officer with the Oklahoma City Police Department (OCPD). (Tr. I, 188.) In addition, one of the State's witnesses, OCPD

Deputy Chief David Shupe, "married into [her] family somewhere two or three times down the line." (Id. at 186.) As for her opinion of the death penalty, Ms. Shetley discussed first considering the death penalty after learning about a high profile capital murder case from years ago that she thought was already "taken care of." Her husband offered to "make some calls" in an attempt to help her avoid jury service in Petitioner's trial, but Ms. Shetley declined, stating that jury service was "something that I felt like I wanted to do as a citizen and as a curious individual." (Tr. II, 262-63.)

Juror Vetter also described having personal connections to law enforcement. She stated that her father-in-law is a retired police chief of the Edmond and Oklahoma City Police Departments. (Tr. I, 121.) Ms. Vetter's brother-in-law is an OCPD police sergeant and her husband has loaned trucks to law enforcement for use in undercover operations. (Tr. II, 187.) Ms. Vetter also disclosed that her husband worked on the campaign for District Attorney Wes Lane, whom she personally knew. (Id. at 191.) She was also good friends with Oklahoma Supreme Court Justice Joseph Watts. (Tr. I, 153.)

Prospective Juror T. Knight stated that two of his relatives were homicide victims. Both his wife's uncle and her cousin were murdered. (Tr. II, 17.) Petitioner concedes that Prospective Juror T. Knight did not serve on the jury. (Pet. at 32.) Under Ross v. Oklahoma, 487 U.S. 81 (1988), a challenge to a trial court's for-cause ruling "is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." Id. at 89. See also Sallahdin v. Gibson, 275 F.3d 1211, 1223 (10th Cir. 2002). In Petitioner's trial, the jury panel that was passed for cause was numbered in sequential

order, with the first twelve seated as the initial, pre-strike jury.  As each side exercised its

peremptory challenges, the next juror in line would replace the stricken juror.  As a result,

the parties were aware which jurors would serve if a peremptory challenge to the seated panel

were exercised.  During this process, Petitioner had one peremptory challenge left and

Prospective Juror T. Knight was next in line.  Petitioner's trial counsel described the

dilemma:

> I am sitting here faced with the decision of bringing Mr. [T.] Knight in who
> has had family members that have been murdered.  He is my next draw.  While
> I would not like to keep either Ms. Shetley or Ms. Vetter because of their
> police backgrounds, I am more fearful of the person who has had murders in
> their family and could sway this jury.

(Tr. III, 125-26).  The OCCA acknowledged the predicament, but reasoned that Petitioner's

counsel remained capable of making an informed decision.  Stouffer, 2006 OK CR 46, ¶ 39,

147 P.3d at 260.

In its opinion denying relief, the OCCA concluded:

> None of these three jurors should have been removed for cause, they
> were not statutorily prohibited from serving, all stated they would follow the
> law, and the trial court did not abuse its discretion in failing to remove them.
> There is no indication in this case, that the jury was biased against [Petitioner].

Stouffer, 2006 OK CR 46, ¶ 40, 147 P.3d at 260.  Even though Mr. T. Knight did not serve

on the jury and Ross presumably precludes review, the OCCA determined the trial court did

not err in refusing to excuse Mr. T. Knight for cause.  Stouffer, 2006 OK CR 46, ¶ 40, 147

P.3d at 260 ("None of these *three* jurors should have been removed for cause . . . .")

(emphasis added).  Similarly, the OCCA determined the trial court acted within its discretion

by denying Petitioner's motions to remove Jurors Shetley and Vetter.  As explained by the OCCA, the jurors "were not statutorily prohibited from serving [and] all stated they would follow the law."  Id.

After review of the record of voir dire, the Court concludes the OCCA's determination is not unreasonable.  The state court's finding as to whether a potential juror is biased is a factual determination entitled to a presumption of correctness under 28 U.S.C. § 2254 (e)(1).  Cannon v. Gibson, 259 F.3d 1253, 1280 (10th Cir. 2001).  Upon questioning by the trial court, each juror stated that their respective answers would not affect their ability to render a decision in Petitioner's case.  (Tr. I, 121-22, 186-90; Tr. II, 16-17.)  Petitioner has failed to rebut the presumption of correctness by clear and convincing evidence.  In addition, Petitioner has not demonstrated that any of the three jurors were "impliedly" biased against him.  See Nell, 526 F.2d at 1229 n.8 (describing implied bias as "situations in which the circumstances point so sharply to bias in a particular juror that even his own denials must be discounted in ruling on a challenge for cause").  As a result, the Court concludes the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.  Petitioner's second claim for relief is denied.

### 3.     Ground Three:  Jury Tampering

In his third ground for relief, Petitioner argues he was deprived of his rights to a fundamentally fair trial and an impartial jury as a result of jury tampering.  (Pet. at 36-41.)  Specifically, Petitioner alleges that Juror Vetter had improper communication with her husband on two occasions during trial.  Petitioner urges the Court to consider Jurors Vetter's

16

actions in conjunction with her ties to law enforcement and alleged misconduct outlined in Grounds One and Two.  Petitioner raised this claim in his Application for Post Conviction Relief.  Respondent argues Petitioner's claim is procedurally barred from this Court's review and that the underlying claim is meritless.  (Resp. at 13-16.)

### a. Procedural Bar

Ordinarily, under Oklahoma law, "[t]he only issues that may be raised in an application for post-conviction relief are those that:  (1) [w]ere not and could not have been raised in a direct appeal; and (2) [s]upport a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent."  22 Okla. Stat. § 1089(C).  Petitioner argued the ineffectiveness of his appellate counsel excused the failure to raise this claim on direct appeal.  Application for Post Conviction Relief, Case No. PCD-2003-835, p. 10.  In its unpublished opinion denying relief, the OCCA did not address whether Petitioner established cause sufficient to excuse the procedural default.  Instead, the state court denied Petitioner's claim as procedurally barred by principles of res judicata:

> [Petitioner] claims that the trial court should have granted a mistrial based on a juror's communication with her husband during trial.  [Petitioner] ties this communication with the juror's other conduct, including allegations of not being forthcoming about an arrest in Texas . . . and claims that this juror was biased against him.  Issues about this juror's conduct (juror Vetter) were raised in proposition eight on direct appeal in support of a bias claim requiring removal for cause.  The fact that the argument here regards the same conduct and no new material conduct is revealed, principles of *res judicata* apply, and [Petitioner] is barred from litigating this issue anew.  Therefore, we find that these issues regarding jury misconduct must fail.

Stouffer, Case No. PCD-2003-835, slip op. at 5 (footnote omitted).  However, a review of Petitioner's state court pleadings reveals that his claim relating to Juror Vetter's conduct was not raised on direct appeal, and therefore was not previously adjudicated.  Respondent concedes the OCCA applied an improper bar to Petitioner's claim, but submits Petitioner's claim remains procedurally barred because it was not raised on direct appeal.  (Resp. at 13, n.3.)

The OCCA's incorrect application of res judicata requires this Court to determine whether the claim can be reviewed on habeas.  In Cone v. Bell, 556 U.S. ___, 129 S. Ct. 1769 (2009), the Supreme Court addressed a similar situation in which a state court improperly denied a claim as having been previously adjudicated.  Cone raised a claim in the first instance on post-conviction review.  However, the Tennessee court concluded it had been previously determined and denied relief.  Id. at 1780.  On writ of certiorari, the Supreme Court noted that the state court incorrectly barred the claim as having been previously adjudicated.[6]  Importantly, even though the claim may have been procedurally defaulted under Tennessee law as waived, the Supreme Court concluded it had no "duty to apply state procedural bars where state courts have themselves declined to do so." Id. at 1782.  Further,

---

[6] The Court also noted that when a state court declines to adjudicate a claim on the basis that it has already been addressed on the merits, there is no bar to federal habeas review:  "When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted.  To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is *ripe* for federal adjudication." Cone, 129 S. Ct. at 1781.

because Tennessee failed to reach the merits of Cone's claim, federal habeas review was not subject to AEDPA's deferential standard in 28 U.S.C. § 2254(d).  Id. at 1784.

Similarly, in Petitioner's case, the OCCA applied an improper bar to Petitioner's claim that Juror Vetter improperly communicated with her husband on two occasions. Additionally, the state court did not reach the merits of Petitioner's claim.  Accordingly, this Court concludes Petitioner's claim is properly before the Court on habeas review and applies a de novo review.

### b.      Factual Basis

Petitioner argues that Juror Vetter engaged in two instances of improper communication during his trial.  First, during an in camera hearing, Juror Vetter disclosed that her husband had called her regarding a newspaper article about the jurors in Petitioner's trial.  (2nd Stage Tr. III, 373-74.)  Upon inquiry from the trial court, Juror Vetter stated that her father-in-law called her husband to discuss the newspaper article.  When her husband called, Juror Vetter told him that she was not able to discuss the article.  Upon questioning by the trial court, Juror Vetter stated that the article did not affect her ability to serve as a fair and impartial juror, nor did it raise any concern about her ability to base her decision on the evidence and the law.  (Id. at 375.)

The second alleged instance of improper communication occurred during second stage closing arguments.  While the jury was deliberating, counsel for Petitioner informed the trial court that Juror Vetter's husband was sitting with members of Mr. Ivens's family.  The trial court took testimony from Deputy Boles, who was tasked with escorting Petitioner during

trial.  Deputy Boles observed Juror Vetter's husband nod and look towards her during

arguments for the State and Petitioner.  Deputy Boles stated:

> The one time that concerned me was that Mr. Wintory had made a point, a good point and the juror looked at the male in the audience and kind of – with a questioned look in her face to me and the juror – the individual in the audience nodded his head and rolled his eyes back which gave me the impression of it's not a good thing.

(2nd Stage Tr. IV, 608).  The trial court noted that Deputy Boles's impressions on the

meaning of the gestures were speculation.  (Id. at 609.)  The trial court denied Petitioner's

motion for a mistrial, noting that the alleged instances of communication and their meaning

were speculative.  (Id. at 615.)  The trial court noted that there was no evidence that

Juror Vetter and her husband spoke about Petitioner's case.  (Id. at 616.)  After the jury

rendered a verdict, Petitioner requested the opportunity to ask Juror Vetter about the alleged

communication.  The trial court denied Petitioner's request.  (Id. at 622.)

### c.    Jury Tampering Law

In Remmer v. United States, 347 U.S. 227 (1954), the defendant moved for a new trial

after learning that a third-party allegedly bribed a juror to render a particular verdict.

Remmer, 347 U.S. at 228.  The Supreme Court remanded the case for a hearing to determine

whether the contact was harmful for petitioner, holding:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the

> Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer, 347 U.S. at 229 (emphasis added).  Petitioner argues he should be afforded this presumption of prejudice.  (Pet. at 40.)  However, Petitioner also acknowledges Smith v. Phillips, 455 U.S. 209 (1982), in which the Supreme Court appeared to retreat from Remmer. (Pet. at 40-41.)   In Phillips, a juror sought employment with the prosecuting district attorney's office during trial.  Phillips, 455 U.S. at 212.  The trial court held a hearing and determined that the juror remained impartial and his employment application did not affect his ability to render a verdict based solely on the evidence at trial.  Id. at 213-14.  On writ of certiorari, the Supreme Court rejected the argument that the juror was impliedly biased and held, while relying upon Remmer, that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  Id. at 215.  As explained by the Fifth Circuit, "[t]his language [of Phillips] is difficult to reconcile with a presumption of prejudice warranting rebuttal by the government." United States v. Sylvester, 143 F.3d 923, 934 (5th Cir. 1998).  See also United States v. Scull, 321 F.3d 1270, 1280 n.5 (10th Cir. 2003) (listing cases in which other circuits have questioned Remmer's holding in light of Phillips).

The Tenth Circuit has acknowledged the tension between Remmer and Phillips. However, in the absence of Supreme Court authority to the contrary, the Tenth Circuit continues to review claims of jury tampering under Remmer.  Scull, 321 F.3d at 1280 n.5. The presumption of prejudice is not dispositive on its own and the prosecution can

demonstrate that the communication was harmless beyond a reasonable doubt.  Id. at 1280.

As explained in Scull, "the most common means of demonstrating the harmlessness of an

extraneous contact is to show the existence of overwhelming evidence of [the] defendant's

guilt."  Id. (internal quotation marks and citations omitted).  Therefore, Petitioner's claim of

jury tampering is subject to harmless error review in which compelling evidence of guilt may

overcome the effects, if any, of improper contact between Juror Vetter and her husband.  Id.

In the present case, the evidence of guilt is overwhelming.  As the OCCA noted

repeatedly throughout its decision, the eyewitness testimony was solid:  "[Petitioner] left a

living eyewitness; one who he has not shown has any reason to lie about what happened or

whose testimony is in any way impeached."  Stouffer, 2006 OK CR 46, ¶¶ 50, 67, 205, 147

P.3d at 262, 264, 280.  In addition to his trial testimony, Mr. Ivens's call for emergency

assistance is also significant, in-the-moment evidence.  In the call, Mr. Ivens, in agony and

of the belief that he is dying, details how Petitioner came to his home to borrow a gun and

then used that same gun to shoot him and Ms. Reaves.  (State's Exs. 1 and 83.)  See Mattox

v. United States, 156 U.S. 237, 244 (1895) ("[T]he sense of impending death is presumed to

remove all temptation to falsehood.").  Beyond the eyewitness testimony, there are also

Petitioner's admissions to Mrs. Ivens.  In phone calls to Mrs. Ivens in the days following the

murder, Petitioner admitted his involvement.  Petitioner told Mrs. Ivens that he went to talk

to Mr. Ivens about an insurance settlement, but that when he saw Mr. Ivens, he just "saw red"

and they got into it.  Petitioner told her how he got the gun from Mr. Ivens under the guise

that there was a burglar at their home.  Petitioner also stated, "And when I left they were dead."  (Tr. V, 190-92, 236-37; Tr. XI, 26-35; State's Ex. 112.)

In addition, and as detailed more fully in Ground Five, <u>infra</u>, the State presented strong evidence of the two aggravating factors found in Petitioner's case.  In comparison, Petitioner's evidence in mitigation was not so compelling as to raise questions on the effect of any error related to Petitioner's claim of jury tampering.  In short, Petitioner's second stage verdict was supported by overwhelming evidence in aggravation, contrasted with a moderate amount of evidence in mitigation.

As to Petitioner's claim of error, any prejudice arising from Petitioner's allegations of jury tampering is minimal.  Juror Vetter disclosed that she did not discuss the contents of the newspaper article with her husband.  In addition, she stated that her phone call with her husband did not affect her ability to render a verdict based upon the law and evidence in the case.  As for Mr. Vetter's alleged improper gestures during second stage argument, the trial court determined that the allegations were speculative in nature.  In light of the compelling evidence of defendant's guilt, and the State's second stage evidence in relation to Petitioner's mitigating evidence, the Court concludes that the alleged instances of improper communication constitute harmless error.  <u>Scull</u>, 321 F.3d at 1280.  Accordingly, Petitioner's third claim for relief is denied.

### 4.    Ground Four:  Right to Testify

In his Ground Four, Petitioner claims that he was denied the right to testify.  Petitioner presented this claim to the OCCA on direct appeal.  The OCCA denied relief, finding that

23

Petitioner's decision not to testify was the product of strategic choice.  Stouffer, 2006 OK CR 46, ¶ 54, 147 P.3d at 262.  Respondent contends that Petitioner is not entitled to relief on this claim because he has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.  The Court agrees.

At the heart of Petitioner's claim is an evidentiary ruling which he asserts prevented him from testifying in his own defense.  Prior to trial, a hearing was held on the admissibility of evidence that Petitioner was involved in a conspiracy to kill Mr. Ivens (the surviving victim), Ron Shotts (Mr. Ivens's friend and attorney), and Beau Cantrell (Petitioner's attorney in his first trial) (M. Tr. 1/15/03, 3-59).  The State sought admission of the evidence because it showed a consciousness of guilt.  See Anderson v. State, 1999 OK CR 44, ¶ 11, 992 P.2d 409, 415 (acknowledging "that actions such as attempting to improperly influence or cause the absence of a material witness at trial are admissions by conduct which are admissible to infer a consciousness of guilt" and citing cases in support thereof).  Petitioner argued that the evidence should not have been admitted because its probative value was substantially outweighed by its prejudicial effect.  12 Okla. Stat. § 2403.  The trial court concluded that the evidence was admissible as to Mr. Ivens only:  "the State may present those statements in furtherance of its case as evidence of conduct of consciousness of guilt as to this case."  The trial court reserved ruling on any hearsay objections to the evidence. (M. Tr. 1/15/03, 43.)

Despite this favorable ruling, however, the State did not present any evidence of the conspiracy in its case-in-chief.  When the defense rested without Petitioner testifying, an in

camera hearing was held regarding his decision not to testify. Petitioner advised the trial

court that he understood his constitutional right to testify, but it was his belief that the trial

court had taken that right from him by ruling that the conspiracy evidence was admissible.

(Tr. XIII, 77-83.)

In denying Petitioner relief on his claim, the OCCA specifically found that "[t]his

evidence would have been admissible whether or not [Petitioner] testified." Stouffer, 2006

OK CR 46, ¶ 53, 147 P.3d at 262. In addition, the OCCA held:

> [Petitioner] has shown no reason why this ruling caused him not to
> testify. This evidence was not presented at trial. There was no ruling, which
> stated that if [Petitioner] testified, all of this evidence would be admissible.
> [Petitioner's] choice not to testify was a strategic choice based on a totally [sic]
> of the circumstances. He was not forced to choose against his right to testify.

Id. ¶ 54 (citation omitted).

"[I]t cannot be doubted that a defendant in a criminal case has the right to take the

witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49

(1987); see also Cannon v. Mullin, 383 F.3d 1152, 1171 (10th Cir. 2004) ("A criminal

defendant has a constitutional right to testify in his own behalf at trial."). Although the right

is "not without limitation[,]" Rock stands for the proposition that a state may not arbitrarily

infringe on a defendant's right to testify. Rock, 483 U.S. at 55-56.

Petitioner has failed to show that the trial court's ruling was either arbitrary or

erroneous. The evidence which the trial court found relevant as consciousness of guilt was

evidence that Petitioner, through fellow death row inmate, Richard Rojem, hired two people,

Billy Jack Blackstone and Richard Allen Blackstone, to kill Mr. Ivens. In Wills v. State,

1981 OK CR 140, ¶ 10, 636 P.2d 372, 376, the OCCA first held that "an effort by an accused to directly or indirectly suppress or destroy evidence is relevant as a circumstance tending to show guilt.  It may be shown that an accused attempted to influence, bribe, or cause the absence of a witness' presence at trial."  The trial court found that Petitioner's statements to Mr. Rojem that he wanted Mr. Ivens killed so he could not be a witness in any further proceedings was proper consciousness of guilt evidence.  (M. Tr. 1/15/03, 43.)  Petitioner has not shown that this ruling was incorrect.  While Petitioner claims that the evidence was false, he offers no support for this assertion.  (Pet. at 48.)  As to any hearsay concerns, the trial court never ruled on that issue, as the matter was reserved until presentation of the evidence.

Additionally, and despite Petitioner's contrary characterization, the record does not support his assertion that the admission of the conspiracy evidence was contingent upon his testifying.  At the January 15th hearing, the trial court found that the evidence was relevant and that its relevance was not substantially outweighed by its prejudicial effect.  The trial court's ruling permitted the State to present the evidence in its case-in-chief.  There was never any mention at the hearing of Petitioner's right to testify, nor any caveat to admission of the evidence (but for hearsay objections to be addressed at a later time).

"The decision whether to testify lies squarely with the defendant[,]" and strategy plays a large role in the decision-making process.  Cannon, 383 F.3d at 1171.  Consistent with the OCCA's decision, the record reveals that Petitioner was not prevented from testifying, but that he made a strategic choice not to do so.  Thus, Petitioner has failed to demonstrate that

the OCCA rendered a decision which is contrary to or an unreasonable application of Supreme Court law, and his Ground Four fails.

### 5.    Ground Five:  Victim Impact Evidence

In his Ground Five, Petitioner asserts that he was denied a fair sentencing proceeding due to the admission of victim impact evidence.  Petitioner raised this claim on direct appeal.  Applying Payne v. Tennessee, 501 U.S. 808 (1991), the OCCA found that the evidence was not unduly prejudicial and denied relief.  Stouffer, 2006 OK CR 46, ¶¶ 143-52, 147 P.3d at 273-74.  Respondent asserts that Petitioner is not entitled to relief because he has not shown that the OCCA's decision is contrary to or an unreasonable application of Payne.

In Payne, the Supreme Court concluded that "the Eighth Amendment erects no *per se* bar" to the admission of victim impact evidence.  Payne, 501 U.S. at 827.  "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."  Id.  However, the Court acknowledged that the Fourteenth Amendment still provides an avenue of redress.  "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  Id. at 825.  In the present case, the OCCA applied Payne and found that although the evidence was "highly charged" and outside the guidelines of its own victim impact statutes, it "did not have a prejudicial effect on the outcome of [the] case."  Stouffer, 2006 OK CR 46, ¶¶ 150-51, 147 P.3d at 274.

The victim impact testimony came through one witness, Ms. Reaves's sister, Dana Wheat. The objectionable portions of Ms. Wheat's testimony include the details of how her ailing father was told of his daughter's death; how the funeral was arranged and its details why the casket had to be closed; and the response received from Ms. Reaves's elementary school students, and the memorial set up at the school in her memory.

The jury was told that Ms. Reaves's father was in the hospital recovering from open heart surgery at the time of the murder. (2nd Stage Tr. III, 444.) Ms. Wheat testified that, on the advice of medical staff, her father's television was turned off (so as to avoid news of the murder) and he was denied visitors. He was told of his daughter's death the next day after being heavily sedated. He was unable to attend the funeral because he was still recovering in the hospital. (Id. at 446-47.)

Regarding the funeral, Ms. Wheat testified that she did not play a significant role in its planning. When Ms. Reaves's sorority sisters learned of her death, they stepped in and planned it all. "[T]hese girls were so close to her that they just knew immediately what – they knew what she would like and so they planned everything. And they would get our approval and we'd just say 'sure' and it was beautiful." (Id. at 447-48.) "They had several songs during the funeral and one of the girls could sing. She was wonderful. She was beautiful. And she did all the singing and another girl played a violin and it was a beautiful funeral." (Id. at 449.)

Ms. Wheat also discussed her decision to close the casket.

> Well, the funeral home told us that she was beautiful.  We – most of her
> friends wanted to say good-bye to her.  They wanted that opportunity.  And so
> we thought things would be okay so we opened the – had the casket opened.
> And when I got down to see her she was appalling.  She couldn't be viewed.
> I just had the casket closed and a picture put on top.  She was not recognizable
> as my sister.

(Id. at 449-50.)  Ms. Wheat additionally testified that when she thinks of her sister, she thinks

of "[t]he way she looked in that coffin."  (Id. at 450.)

Finally, Ms. Wheat testified that her sister was an elementary school teacher.  (Id. at

451.)  She testified that after her sister died, they received a packet of letters and pictures

from her students which was emotionally touching.  She also testified about how she had to

go to the school and gather up her sister's personal items from her classroom.  Among her

personal belongings was an Indian shawl she had received from a student's mother.  Ms.

Wheat gave the shawl to the school and was told that it would be placed in the school's

library as a memorial.  (Id. at 452.)

The Court agrees with the OCCA's conclusion that this testimony was emotionally

charged and stretched beyond what is deemed appropriate victim impact testimony.

However, the Court cannot conclude that the OCCA acted unreasonably in denying

Petitioner relief.  Given the other evidence presented, the OCCA's determination that Ms.

Wheat's testimony did not render Petitioner's sentencing fundamentally unfair is not contrary

to or an unreasonable application of Payne.  See Short v. Sirmons, 472 F.3d 1177, 1193 (10th

Cir. 2006) ("[W]e must assess the alleged prejudicial effect of the victim-impact testimony

by examining the aggravating and mitigating factors and the overall strength of the State's case.").

The State alleged three aggravating circumstances:  (1) great risk of death to more than one person; (2) murder to avoid arrest or prosecution; and (3) continuing threat.  (O.R. V, 1000-01.)  In support of the first two aggravators, the State relied upon the evidence presented in the first stage.  (2nd Stage Tr. I, 44-45; 2nd Stage Tr. II, 142-43.)  With the exception of Ms. Wheat's testimony, the evidence presented by the State in the second stage related solely to the issue of whether Petitioner was a continuing threat.  The State presented six witnesses regarding Petitioner's actions and behavior while incarcerated, five witnesses regarding Petitioner's involvement in a conspiracy to kill others (see Ground Four), and Johnny Albert, an attorney who had previously represented Petitioner and whose life Petitioner had once threatened.

The jury rejected the continuing threat aggravator, but found the great risk of death and murder to avoid arrest aggravators.  (O.R. X, 1928.)  Both of the aggravators found by the jury were supported by the very evidence of the crime itself.  Stouffer, 2006 OK CR 46, ¶¶ 140, 142, 147 P.3d at 272, 273.  As discussed infra in connection with Petitioner's Ground Eight, the evidence was overwhelming that Petitioner's actions created a risk of death to more than one person.  In addition to killing Ms. Reaves, Petitioner attempted to kill Mr. Ivens.  As to the murder to avoid arrest aggravator, the evidence supported a finding that Petitioner killed Ms. Reaves because she was the only witness to his shooting of Mr. Ivens.  Believing that he had killed them both, Petitioner even staged the scene to make it look like

a murder/suicide by placing the gun next to Ms. Reaves's head and right hand.  (Tr. V, 182;

Tr. VIII, 72, 119, 140-44; Tr. XI, 140; State's Ex. 29.)

Petitioner presented five witnesses in mitigation, including his mother and son.  The

first witness, Kathleen Mayfield, had known Petitioner since 1979.  (2nd Stage Tr. III, 461.)

She testified that "[e]verybody loved Bud [Petitioner]."  She testified that Petitioner had a

"dynamo personality," and she described him as a spiritual man who loved God and helping

people.  (Id. at 463.)  She testified that she and Petitioner "are like prayer partners," and she

has "never known anyone like him that knows how to communicate and care and help you

with your situations that you need help with."  (Id. at 468.)  A second witness, Dr. Raymond

Cook, described a similar Christian relationship with Petitioner over the thirty-five years he

had known him.  He testified that Petitioner "was probably one of the most learned people

of the Bible that [he had] ever met."  Dr. Cook described Petitioner's work with the church,

and he described Petitioner as "a very fine person."  (Id. at 472-76.)  A minister also testified

about his contact with Petitioner.  He expressed his opinion that "anybody that really knows

[Petitioner] [cannot] help but be affected by his warmth and his gentleness and his

consideration and his knowledge of the Bible."  (Id. at 485-89.)

Petitioner's son, Trey Stouffer, who was a teenager when Ms. Reaves was killed,

testified about his relationship with his father.  Although his parents were divorced, Trey

testified that he had visitation with his dad and he was "a very good father."  (Id. at 491.)  In

the summer just prior to Ms. Reaves's murder, Trey had spent the summer with his dad at the

lake.  He testified that Petitioner would spend endless hours teaching kids to ski, and that

their dock "was basically the happenest dock on the lake." (Id. at 492.)  Trey testified that

Petitioner was great with Mr. Ivens's girls and that he treated them like they were his own.

Finally, despite the murder and Petitioner's imprisonment, Trey still maintained a good

relationship with his father.  (Id. at 493-94.)

Petitioner's mother, Joyce Stouffer, testified about Petitioner's upbringing and her

relationship with her son.  She told the jury that Petitioner was a Boy Scout, excelled in

sports, and attended college.  (Id. at 496-97.)  Mrs. Stouffer testified that Petitioner was like

his father – "They were both strong physically, mentally and spiritually and proud of all of

their efforts."  (Id. at 498.)  She testified that Petitioner was always good to check on her, and

that they have always had a good relationship.  (Id. at 499-500.)  Mrs. Stouffer testified that

she continues to visit Petitioner during his incarceration, and that she is very proud of him

for his spiritual strength.  (Id. at 500-02.)

Looking at the totality of the second stage evidence, the OCCA's determination that

Ms. Wheat's testimony did not prejudice Petitioner is a reasonable one.  The evidence

supporting the aggravators was strong, and while Petitioner's mitigation evidence showed

that Petitioner possessed some positive attributes, it was not so compelling as to conclude

that Ms. Wheat's testimony tipped the scales in favor of a death sentence.  In addition,

although the jury did not find that Petitioner was a continuing threat, the extensive evidence

presented in support thereof cannot be ignored in this analysis.  See Selsor v. Workman,

644 F.3d 984, 1027 (10th Cir. 2011) (considering continuing threat evidence in the context

of a harmless error analysis based on improper victim impact evidence even though the jury

did not find the continuing threat aggravator and noting that the evidence "nevertheless painted a picture of [the petitioner] that was certainly less than flattering, and that weighed heavily in favor of imposition of the death penalty"). The jury was advised of Petitioner's less than exemplary conduct while in prison, including an altercation with a cell mate, possession of a "sticker" weapon, threats to prison staff, and numerous misconducts (2nd Stage Tr. I, 61, 80-83; 2nd Stage Tr. II, 176, 185-88, 191, 222-26; State's Ex. 115); his solicitation of hit men to kill Mr. Ivens and two others (2nd Stage Tr. II, 319-20, 325-27, 331-34); and his threat to kill his prior attorney if he did not win Petitioner's case (2nd Stage Tr. III, 430). Considering all this evidence, the Court agrees with the OCCA that the improper portions of Ms. Wheat's testimony did not deprive Petitioner of a fundamentally fair sentencing proceeding. Accordingly, Petitioner's Ground Five is denied.

### 6. Ground Six: Ineffective Assistance of Counsel

In his sixth claim for relief, Petitioner argues his counsel during trial and on direct appeal were ineffective. Petitioner also requests an evidentiary hearing if the Court "harbors any doubt" as to Petitioner's claim of ineffective assistance of counsel. (Pet. at 53-59.)

"'[T]he right to counsel is the right to the effective assistance of counsel.'" Strickland, 466 U.S. at 686 (quoting McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. Under Strickland, a party asserting ineffective assistance of counsel must show that (1) counsel's performance was

deficient and (2) that the deficient performance prejudiced him.  Id. at 687.  Because Petitioner must establish both Strickland prongs, a reviewing court need not analyze both deficient performance and prejudice.  Id. at 697.

To establish deficient performance, Petitioner must demonstrate "that counsel's representation fell below an objective standard of reasonableness."  Id. at 688. Reasonableness of performance is judged against "prevailing professional norms."  Id.  This determination is "highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  Counsel's performance "'must have been completely unreasonable, not merely wrong.'"  Hooks v. Workman, 606 F.3d 715, 723 (10th Cir. 2010) (quoting Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999)).

In addition, Petitioner must affirmatively prove that the deficient performance was prejudicial to his defense.  Strickland, 466 U.S. at 693.  Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "Establishing a reasonable probability of a different outcome requires something less than a showing 'counsel's deficient conduct more likely than not altered the outcome in the case.'  Instead, a reasonable probability is one 'sufficient to undermine confidence in the outcome.'"  Hooks, 606 F.3d at 724 (citation omitted) (quoting Strickland, 466 U.S. at 693, 694).

34

Under 28 U.S.C. § 2254, a claim of ineffective assistance of counsel is a mixed question of law and fact.  Strickland, 466 U.S. at 698.  On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'"  Knowles v. Mirzayance, 556 U.S. 111, ___, 129 S. Ct. 1411, 1420 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).  This Court's review of the OCCA's determination is therefore "doubly deferential."  Id.

With respect to his trial counsel, Petitioner alleges trial counsel failed "to present exculpatory evidence at trial or make contemporaneous objections to trial errors" and that these failures prejudiced him.  (Pet. at 58.)  Without argument,[7] Petitioner points to five claims of trial counsel ineffectiveness:  (1) trial counsel failed to object to admission of Petitioner's shirt which had been handled by Joyce Gilchrist; (2) trial counsel failed to cross examine a State's witness on the fact that Petitioner's shirt was handled by Joyce Gilchrist; (3) trial counsel failed to present evidence that additional testing found DNA on Mr. Ivens's shirt that did not belong to Petitioner, Mr. Ivens, or Ms. Reaves; (4) trial counsel failed to question a defense expert about the anonymous DNA; and (5) trial counsel failed to present evidence about phone calls made to the police at the time of the murder concerning

---

[7] Respondent also presents no argument on the issue of trial counsel's ineffectiveness. Respondent summarily asserts that the OCCA's determination denying Petitioner's claims of ineffective assistance of trial and appellate counsel is not contrary to, nor an unreasonable application of, clearly established federal law (Resp. at 31-32).

suspicious vehicles in the neighborhood and a man screaming nearby. (Pet. at 55-56). These

claims were presented on direct appeal and the OCCA denied relief.

With respect to the handling of Petitioner's shirt, the OCCA concluded that

Petitioner's trial counsel was not ineffective:

> [Petitioner] claims that the mere fact that Gilchrist handled the evidence
> at some point in time makes the results of any testing unreliable. He cites to
> a memorandum which states that [Petitioner's] shirt and jacket were missing
> for some time. Obviously, these items were found in 2001 because they were
> sent for independent testing which resulted in the inconclusive results.
>
> Officers testified that these items were in the same condition as when
> they first observed them. Any weakness in chain of custody goes to the weight
> to be given to the evidence and does not prevent admissibility. Brown [v.
> State], 1998 OK CR 77, ¶ 58, 989 P.2d [913] at 929. The evidence here was
> admissible and the jury could give the evidence whatever weight it was due.
> Defense counsel was not ineffective based on this claim.

Stouffer, 2006 OK CR 46, ¶¶ 192-93, 147 P.3d at 279 (footnote omitted). The OCCA also

addressed Petitioner's claim as it related to DNA evidence:

> [Petitioner] next claims that trial counsel was ineffective for failing to
> utilize evidence that showed that there was DNA evidence from an unknown
> source found on Ivens's shirt. This DNA evidence excluded Doug Ivens,
> Linda Reaves and [Petitioner]. The trial attorney had this information and had
> endorsed two witnesses to testify about this evidence; however, trial counsel
> did not use this evidence at trial.
>
> In the earlier proposition, [Petitioner] attacks the handling of his own
> shirt and jacket while in the custody of the Oklahoma City Police Lab, and
> then he ignores all of the fallacies of this lab when he wants to introduce this
> evidence. However, this does not explain the failure to take advantage of
> further testing. The resolution of this issue lies in the facts of this case, which
> shows that the speck of unknown blood is not exculpatory. Exculpatory
> evidence is evidence that if admitted would create reasonable doubt that did
> not exist without the evidence. Ellis v. Mullin, 326 F.3d 1122, 1128 (10th Cir.
> 2002).

Determining whether this DNA evidence is exculpatory involves a determination that the evidence was favorable to the defense and a showing of "materiality" – that there is a reasonable probability that, had it been utilized by the defense, the result of the proceeding would have been different.  See Van Woudenberg v. State, 1997 OK CR 38, ¶ 10, 942 P.2d 224, 227-28.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Sadler v. State, 1993 OK CR 2, ¶ 19, 846 P.2d 377, 383.  The "mere possibility" that an item might have affected the outcome of the trial does not establish "materiality" in the constitutional sense.  Van Woudenberg, 1997 OK CR 38, ¶ 10, 942 P.2d at 228.

[Petitioner] admitted, to Velva Ivens, that he shot Doug Ivens.  He left a living witness in Doug Ivens.  He has shown no reason for Doug Ivens to lie other than the unsubstantiated theory that Doug Ivens killed Reaves before he got there.  None of the evidence supports this theory.  One speck of unknown blood in this case is not exculpatory to [Petitioner].

Stouffer, 2006 OK CR 46, ¶¶ 194-97, 147 P.3d at 279-80 (footnote omitted).  The Court agrees with the analysis of the OCCA and concludes Petitioner was not prejudiced by counsel's conduct.[8]  The Court is similarly unpersuaded that counsel's failure to pursue and present evidence of police reports of suspicious vehicles and screaming on the night of the crime prejudiced Petitioner.[9]

---

[8] It appears that the OCCA applied an incorrect standard to Petitioner's Strickland claim.  See Stouffer, 2006 OK CR 46, ¶ 198, 147 P.3d at 280 ("This evidence does not contain sufficient information to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize this evidence."); see also Wilson v. Workman, 577 F.3d 1284, 1292 (10th Cir. 2009) (holding that Oklahoma's "clear and convincing" evidentiary standard in Rule 3.11 is not entitled to AEDPA deference because it places a higher evidentiary burden than the Strickland "preponderance of the evidence" standard).  However, even under a de novo review, Petitioner's claim of ineffective assistance of counsel fails.

[9] The OCCA again applied an incorrect standard to Petitioner's claim of ineffective assistance of trial counsel.  Stouffer, 2006 OK CR 46, ¶ 201, 147 P.3d at 280 ("[Petitioner] has not presented clear and convincing proof to this Court that counsel was ineffective for failing to present this evidence."); see also supra note 8.

Regarding Petitioner's challenges to the effectiveness of his appellate counsel, the Court finds that these claims have already been adequately addressed. In Ground One, the Court resolved Petitioner's claim of ineffective assistance of appellate counsel for failure to raise a claim of juror misconduct. See supra Part III.C.1. In addition, the Court has already addressed the merits of Grounds Two and Three. See supra Part III.C.2-3. Therefore, appellate counsel's failure to raise these claims was not deficient performance. See Freeman v. Attorney Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . .").

Accordingly, Petitioner's sixth claim for relief and request for evidentiary hearing is denied.

### 7. Ground Seven: Prosecutorial Misconduct

In his Ground Seven, Petitioner contends that prosecutorial misconduct rendered his trial fundamentally unfair. On direct appeal, Petitioner alleged several instances of prosecutorial misconduct. The OCCA reviewed each instance and found that relief was not warranted either individually or cumulatively. Stouffer, 2006 OK CR 46, ¶¶ 153-84, 147 P.3d at 274-78. In his presentation of the claim to this Court, Petitioner reasserts all instances but takes particular issue with the OCCA's cumulative error analysis. Petitioner argues that when some of the instances are considered in the aggregate, relief is warranted. In response, Respondent asserts that the OCCA was correct to deny Petitioner relief. In addition to his analysis of each alleged instance of misconduct, Respondent asserts that the overwhelming evidence presented in both stages justifies the denial of relief.

38

Generally, allegations of prosecutorial misconduct are subjected to due process review. Hamilton v. Mullin, 436 F.3d 1181, 1187 (10th Cir. 2006). The question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). As the Supreme Court has acknowledged, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985). Thus, a fundamental fairness inquiry "requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002). "Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment." Ultimately, the focus is on whether the jury was able "to judge the evidence fairly in light of the prosecutor's conduct." Id.

### a.      Examination of Witnesses

Petitioner raises two complaints with respect to the prosecutor's questioning of witnesses. Petitioner's first complaint concerns the prosecutor's questions to Oklahoma City Police Officer Richard Neaves regarding his actions on the night Ms. Reaves was murdered. Officer Neaves was at Mrs. Ivens's home when Petitioner arrived. While Officer Neaves excused himself to step outside and contact his boss for instructions, other officers allowed

Petitioner to use the bathroom alone.  When he came out of the bathroom, Petitioner asked

to change his clothes; however, this request was denied.  The prosecutor asked Officer

Neaves if Petitioner was wearing any gloves that night.  Officer Neaves testified that he did

not recall.  The prosecutor then asked Officer Neaves what he would have done if Petitioner

had come in wearing gloves.  Officer Neaves responded that he would have seized them for

their evidentiary value.  The prosecutor then followed up with, "Nevertheless, your young

guys didn't do it?"  (Tr. V, 253-59.)  It is Petitioner's contention that the prosecutor's

questions inappropriately introduced a speculative theory that he was wearing gloves and that

he disposed of them while he was in the bathroom unattended.

Because the prosecutor's questions "were properly based on the evidence and the

circumstances surrounding the arrest or apprehension of [Petitioner,]" the OCCA found that

no misconduct occurred.  Stouffer, 2006 OK CR 46, ¶ 159, 147 P.3d at 275.  The OCCA

detailed the relevant evidence as follows:

> Ivens testified that he "believed" that [Petitioner] was wearing gloves
> at the time of the shooting. Velva testified that [Petitioner] kept a pair of brown
> leather gloves in his leather coat pockets.  She could not remember if he was
> wearing the gloves when he left her house before the shooting.
>
> There was a period of time between the shooting and the time
> [Petitioner] arrived at Velva's house.  After he arrived at Velva's house, he
> was allowed to go into the bathroom unattended.  Even though officers
> searched, no gloves were ever recovered.  The State cannot explain the
> absence of gloves.
>
> The prosecution made it clear that if he had been wearing gloves, they
> would have been seized.  Major Richard Neaves, an experienced police
> supervisor, testified that he could not recall if [Petitioner] was wearing gloves
> when he came to Velva Ivens's house, but if he had been, the gloves would

> have been seized.  Two less experienced officers allowed [Petitioner] to go into the bathroom unsupervised.  The jury was left to speculate that [Petitioner] could have disposed of the gloves while he was in the bathroom – or somewhere else before he got to Velva's house.

Id. ¶¶ 156-58, 147 P.3d at 274-75.  Petitioner has not demonstrated any fault in the OCCA's analysis.  Given the other evidence presented, the OCCA reasonably determined that the prosecutor's questions were permissible.

Petitioner additionally complains about the prosecutor's questioning of Oklahoma City Police Officer James Gibbons.  Officer Gibbons was one of the first officers to arrive at the murder scene.  Although testifying some eighteen years later, Officer Gibbons stated that his memory of that night was "[s]till very clear.  Certain images are ingrained on my memory that I'll probably never be able to forget." (Tr. VIII, 116.)  Officer Gibbons testified about his actions at the scene.  As he testified about first seeing Ms. Reaves, he closed his eyes and once again referenced the impact that night had on him:  "I had never in my life seen anything like that prior to or since." (Id. at 119.)  Officer Gibbons described Ms. Reaves's condition and position as well as the location of the gun.  Because Ms. Reaves was still breathing, Officer Gibbons felt it necessary to move the gun for safety reasons. (Id. at 119-20.)  In a follow-up question, the prosecutor asked Officer Gibbons if he saw anything else that made him think Ms. Reaves was still alive.  Officer Gibbons testified that he "believed that her left eye followed [him], that she was conscious of [his] presence and that her eye actually moved and saw that something was happening in front of her.  It was frightening." (Id. at 121.)

Petitioner contends that the prosecutor brought out the "gruesome" testimony about Ms. Reaves's moving eye for the purpose of inflaming the jury. However, the OCCA found no error in the prosecutor's questioning. In particular, the OCCA found that the "questioning was elicited to show the impact of the scene on the first responders . . . [and] why they moved the pistol." Stouffer, 2006 OK CR 46, ¶ 181, 147 P.3d at 277. Again, Petitioner has not shown that the OCCA's determination is unreasonable and/or contrary to Donnelly. While the image of Ms. Reaves's eye moving is somewhat unsettling, it was a part of Officer Gibbons's experience and it was one of the reasons why he believed Ms. Reaves was still alive and thus potentially capable of accessing the gun lying next to her.

### b.       First Stage Closing Argument

Petitioner raises six complaints with the prosecutor's first stage closing argument. As discussed below, Petitioner additionally argues that four of these complaints justify relief on their cumulative nature.

In the first instance, Petitioner asserts that the prosecutor deliberately elicited victim sympathy with the following comment: "The woman that Doug Ivens loves screams, Dana Wheat's sister, last words, 'no.'" (Tr. XIII, 105.) There was no objection to the comment. Because the comment was based on the evidence, the OCCA found no plain error. The OCCA nevertheless noted that the comment was "an attempt to elicit an emotional response." Stouffer, 2006 OK CR 46, ¶ 161, 147 P.3d at 275. However, even with its emotional potential, the OCCA's determination that this brief comment did not deny Petitioner a fair trial is reasonable.

42

Next, Petitioner asserts that the prosecutor argued facts not in evidence when he made the following comments about Officer Gibbons:

> You saw one of our officers here, you remember Jim Gibbons, the other officer, the guy still in uniform, still doing the same job.  The powerful thing about jury trials, as close as you're sitting, Jim Gibbons has nightmares about this, you can see the nightmares in his eyes.  He smells and he sees Linda Ivens now.  I'm sorry, Linda Reeves [sic].  He sees her now.

(Tr. XIII, 105-06).  There was no objection to these comments.  Again, the OCCA found no plain error.  Although the OCCA found that the comments "were calculated to elicit an emotional response[,]" the OCCA additionally found that "they did not affect the jury's finding of guilt."  Stouffer, 2006 OK CR 46, ¶ 163, 147 P.3d at 275.  As discussed above, Officer Gibbons's testimony clearly demonstrated that he was deeply affected by his role as a first responder to the murder scene.  While the prosecutor's references to nightmares and seeing Ms. Reaves may have stretched the bounds of proper comment, they were anchored somewhat by the testimony given and cannot, in any event, be said to have affected the jury's assessment of guilt.

Immediately after these comments about Officer Gibbons, the prosecutor discussed the testimony of another police officer, Bryan Aaron.

> Bryan Aaron comes in.  We were all younger and prettier back then.  But some of the aging comes from what we make these folks see and what they saw when they came in that night, what you've now been cursed with, charged with.  Doug is trying to get up.  Incredibly Doug is trying to get up.  Golly, why doesn't he just die?

(Tr. XIII, 106).  Again, no objection was made.  Petitioner's argument is that Officer Aaron never testified about the effect the scene may have had on him and these comments were for

the continuing purpose of eliciting sympathy.  However, the OCCA once again found no

plain error.  The OCCA held as follows:

> This argument was meant to show that [Petitioner] shot Ivens with the intent
> to kill; however, speculation about how it affected this officer was irrelevant.
> Nevertheless, it did not rise to the level of plain error.

Stouffer, 2006 OK CR 46, ¶ 165, 147 P.3d at 275.  This determination is not unreasonable.

Next, Petitioner complains that the prosecutor made a comment which was not only

outside the presented evidence but intended to inflame the jury.  In this portion of closing

argument, the prosecutor was describing Petitioner's actions with respect to Ms. Reaves.  The

prosecutor stated:

> So he [Petitioner] walks back again from over there to over here
> (indicating).  You've seen the scene.  There's no dispute in the evidence on
> this.  Ed Hueske, their expert, makes clear that the combination of the evidence
> is clear Linda Reeves' [sic] brain, hair, is all over this room in front of him.
> He walks back up and he takes this hand – you remember the police describe
> Linda is still breathing.  She is still breathing.  She was not conscious and I
> don't want to – I don't want to say she was, but think about what this says
> about [Petitioner].  Her eye followed [Petitioner] walking across the room just
> like it followed the officers and the EMT.

(Tr. XIII, 107).  Petitioner objected to the evidence, but the trial court overruled the

objection, finding that the comment was a proper comment on the evidence.  (Id. at 107.)

The OCCA found no error in the prosecutor's argument.  Agreeing with the trial court,

it also concluded that the "argument was a fair inference on the evidence."  Stouffer, 2006

OK CR 46, ¶ 169, 147 P.3d at 276.  Examining the comment in context, as Young directs a

court to do, the OCCA found "the prosecutor was identifying facts which reveal

[Petitioner's] state of mind at the time of the killing and after the killing." Id. ¶ 167, 147 P.3d at 276.

> The prosecution goes on to argue that [Petitioner] had an hour to clean himself up, get rid of gloves and compose himself before he sees the police. Furthermore, the prosecution argues that [Petitioner] believed, at that time, that there are no living witnesses, and that even if Doug Ivens is in critical condition, he will not live.
>
> At this point, [Petitioner] had no idea that Ivens had named him as the shooter, so his cool demeanor and state of mind, which may indicate innocence, had to be explained away by the prosecution. This argument was a fair inference on the evidence and the argument was supported by the evidence introduced at trial.

Id. ¶¶ 168-69, 147 P.3d at 276.

The Court likewise finds no error in the prosecutor's argument. As noted above in discussion of Officer Gibbons's testimony, evidence was presented that Ms. Reaves's eye was moving after she had been shot.[10] If it was moving when Officer Gibbons arrived, it is a fair assumption that it was moving when Petitioner was there. The inference made by the prosecutor was if the moving eye frightened Officer Gibbons, what effect did it have on Petitioner? Given the evidence that the scene was staged after Ms. Reaves was shot, the prosecutor's argument was that it did not. This is a fair comment on the evidence.

Petitioner's next complaint is to the prosecutor's references to him as "cold-blooded," and how he killed Ms. Reaves in cold blood and with ice in his veins. (Tr. XIII, 105, 108, 124.) Petitioner contends that these references were improper attempts to inflame the jury.

---

[10] Officer Aaron also testified that Ms. Reaves appeared to look at them. (Tr. VIII, 166.)

Petitioner, however, made no objections to these comments at trial and the OCCA found that the comments did not amount to plain error because they were supported by the evidence. Id. ¶ 170, 147 P.3d at 276. The Court cannot conclude that the OCCA's determination of this complaint is unreasonable. Examined in context, the references related to Petitioner's actions and cool demeanor, as referenced by the OCCA above, as he abruptly and without any apparent provocation went to Mr. Ivens's house, shot both Mr. Ivens and Ms. Reaves, staged the scene, cleaned himself up, went to the post office, returned to Mrs. Ivens's house, and then denied having ever been at Mr. Ivens's house. Under these circumstances, the comments do not amount to prosecutorial misconduct.

Petitioner's final complaint with the prosecutor's argument concerns references to the burden of proof. Petitioner contends that the prosecutor acted egregiously in an attempt to shift the burden of proof to him. The record reflects that the prosecutor argued that defense counsel gave the jury a "bounced check" by telling the jury in opening statement that he was going to present certain evidence about an altercation but did not do so. This comment incited a passionate objection, the result of which was the trial court's admonishment to the jury (Tr. XIII, 132-33) ("Ladies and gentlemen of the jury, I remind you that it is the State of Oklahoma that carries the burden of proof in this case, not the defense."). While the prosecutor continued the "check" references and argument as to the lack of evidence of self-defense, the prosecutor also stated that it was not Petitioner's burden, but the State's burden; however, the State's burden was easily met due to lack of evidence. (Id. at 133-36.)

The OCCA found that the prosecutor's argument "reveal[ed] a desire . . . to point out that [Petitioner], or his attorney, did not live up to their word." Stouffer, 2006 OK CR 46, ¶ 177, 147 P.3d at 277. Although this was an improper attack on defense counsel, the OCCA determined that the trial court's admonishment cured the error. Id. As to additional argument by the prosecutor on the burden of proof, the OCCA found that "[t]he prosecutor was merely pointing out the lack of evidence supporting a self-defense claim – showing that the State met its burden of showing that [Petitioner] did not act in self-defense." Id. ¶ 178, 147 P.3d at 277. Accordingly, the argument was proper. Id.

Petitioner has failed to show that the OCCA unreasonably determined this claim. The objection by trial counsel and the admonishment given by the trial court prevented the prosecutor from inappropriately straying from clearly established law on the burden of proof. See Wilson v. Sirmons, 536 F.3d 1064, 1119 (10th Cir. 2008) ("Even if the prosecutor's comments were improper, however, the trial court's admonition to the jury cured any error."). Thereafter, the prosecutor's continuing comments gave strict acknowledgment to the burden of proof and related to the self-defense evidence presented (or lack thereof). Under these circumstances, Petitioner was not denied a fundamentally fair trial.

### c.      Cumulative Effect

Petitioner argues that even if the individual actions of the prosecutor do not entitle him to a new trial, consideration of his actions in the aggregate does. In support of this argument, Petitioner cites particularly to the following comments made during closing argument and discussed above: (1) referring to Ms. Reaves as Mr. Ivens's love and Ms. Wheat's sister;

(2) references to Officer Gibbons's nightmares; (3) comments related to Officer Aaron; and (4) statements regarding the burden of proof.  Petitioner asserts that the OCCA erred in not granting relief upon review of these instances in the aggregate.[11]

Reviewing the prosecutorial misconduct claims in their totality, the OCCA concluded that "[s]ome of these comments and questions do amount to prosecutorial misconduct, but the cumulative effect of this misconduct is not sufficient to warrant reversal in this case." Stouffer, 2006 OK CR 46, ¶ 184, 147 P.3d at 278 (footnote omitted).  Given the evidence presented in both stages of the trial, the Court is not persuaded by Petitioner's contention that this finding by the OCCA is in error.  As previously discussed in Ground Three, the evidence of Petitioner's guilt is overwhelming.  In addition, and as previously discussed in connection with his Ground Five, the evidence supporting the aggravating circumstances is great as well.

In conclusion, for the reasons set forth above, Petitioner is not entitled to relief on his Ground Seven.  Petitioner has not shown that the OCCA's decision denying him relief on his claim of prosecutorial misconduct, both individually and cumulatively, is contrary to or an unreasonable application of Supreme Court law.  Ground Seven is therefore denied.

---

[11]  Petitioner also notes, without arguing its individual merit, that the OCCA considered an additional instance of misconduct in its cumulative assessment. (Pet. at 67.)  See Stouffer, 2006 OK CR 46, ¶¶ 91-94, 153 n.14, 147 P.3d at 266-67, 274 n.14.

### 8.    Ground Eight:  Aggravating Circumstance

In his Ground Eight, Petitioner attacks the constitutionality of the great risk of death aggravator.  Petitioner contends that it is both vague and overbroad.[12]  Petitioner raised this claim on direct appeal, but the OCCA denied relief.  Stouffer, 2006 OK CR 46, ¶¶ 138-39, 147 P.3d at 272.[13]  Respondent asserts that this claim should be denied because Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

In order to satisfy the Eighth Amendment, an aggravating circumstance must meet two requirements:  (1) it must not apply to every defendant convicted of murder; and (2) it must not be unconstitutionally vague.  Tuilaepa v. California, 512 U.S. 967, 972 (1994).  In denying Petitioner relief on this claim, the OCCA relied upon its prior decision in Dodd v. State, 2004 OK CR 31, 100 P.3d 1017.  Stouffer, 2006 OK CR 46, ¶ 139, 147 P.3d at 272. In Dodd, the OCCA found that Oklahoma's great risk of death aggravator satisfied Tuilaepa.

> Appellant also complains that the "great risk of death" aggravating circumstance is invalid because it does not effectively narrow the field of

---

[12] Petitioner makes an additional argument that the two aggravators found by the jury, great risk of death and murder to avoid arrest or prosecution, are incompatible. (Pet. at 73-74.) Although Petitioner asserts that his Ground Eight was exhausted on direct appeal in his propositions twelve and fourteen, Respondent has correctly asserted that this particular claim was not raised. Because the claim is unexhausted, Respondent urges the Court to apply procedural bar. The Court agrees and finds that this claim is procedurally barred. See Anderson v. Sirmons, 476 F.3d at 1139 n.7 ("'"Anticipatory procedural bar" occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.'") (quoting Moore v. Schoeman, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002)).

[13] On direct appeal, Petitioner also challenged the sufficiency of the evidence supporting the great risk of death aggravator. Petitioner does not present that claim here.

intentional murders eligible for the death penalty.   Appellant claims this aggravating circumstance results in "automatic death eligibility" whenever more than one person is murdered at the same time and place.  So it does.  The fault in Appellant's argument, of course, is that he is comparing one subclass of intentional murders with itself.  The real issue is whether the aggravating circumstance results in "automatic" death-sentence eligibility in *every* first-degree murder case.  Obviously, not all intentional murders are committed in circumstances which pose a great risk of death to more than one person. This aggravating circumstance narrows death-sentence eligibility to particular conditions not inherent in every case, which is all it is constitutionally required to do.  See Tuilaepa v. California, 512 U.S. 967, 972, 114 S. Ct. 2630, 2635, 129 L.Ed.2d 750 (1994); McElmurry [v. State], 2002 OK CR 40, ¶ 104, 60 P.3d [4] at 27.

Dodd, 2004 OK CR 31, ¶ 108, 100 P.3d at 1048.

Citing Dodd and the OCCA's decision in Snow v. State, 1994 OK CR 39, 876 P.2d 291, Petitioner's argument is that "it is impossible to tell in what circumstance a defendant creates a great risk of harm to more than one person." (Pet. at 73.)  In Snow, the defendant argued that the great risk of harm aggravator should only apply when, as in Dodd, more than one person is killed.  In denying this argument, the OCCA held that "it is not the death of more than one person which supports this aggravating circumstance, but the defendant's acts that create the risk of death to another which are in close proximity, in terms of time, location and intent to the act of the killing itself."  Snow, 1994 OK CR 39, ¶ 24, 876 P.2d at 297. Thus, Petitioner argues that it is unclear when the aggravator applies.

Oklahoma law is clear that the aggravator applies if a defendant's actions place more than one person at great risk of death.  Of course, one death must occur to make a defendant death eligible.  If another death occurs, then clearly there was a great risk to more than one; however, another person need not die to satisfy the aggravator.  If the risk of death to another

was great, the aggravator is met.  See Williams v. Workman, No. 02-CV-0377-JHP-FHM, 2011 WL 841064, at *36 (N.D. Okla. Mar. 7, 2011) (unpublished) ("The OCCA has consistently interpreted the 'great risk of death to more than one person' aggravating circumstance in two ways."); Selsor v. Workman, No. 01-CV-0721-CVE-TLW, 2009 WL 3233806, at *41 (N.D. Okla. Sept. 29, 2009) (unpublished) (Oklahoma's great risk of death aggravator applies in two circumstances:  (1) when a defendant knowingly creates a great risk of death to more than one person; and (2) when more than one person is killed).  In the present case, Petitioner killed Ms. Reaves and shot Mr. Ivens three times.  Stouffer, 2006 OK CR 46, ¶ 5, 147 P.3d at 256.  Two of the shots to Mr. Ivens were life-threatening.  One shot, a "ten ring" shot, was to his chest and caused severe abdominal injuries and bleeding. Another shot, a "killing" shot, was to his head.  This shot narrowly missed his carotid artery and jugular vein.  Mr. Ivens lost thirty pints of blood in the first three days and one hundred pints of blood during his ten-week hospital stay.  In the opinion of the attending physician, nine out of ten people would have not survived the injuries Mr. Ivens sustained.  (Tr. VIII, 177-79; Tr. X, 83-89, 92-96.)  Clearly, the great risk of death aggravator was supported in the present case.  See Stouffer, 2006 OK CR 46, ¶ 140, 147 P.3d at 272 (finding the evidence sufficient to support the aggravator; "Both Ivens and Reaves were shot with the same weapon, at the same place, and at essentially the same time.").

In addition, the Tenth Circuit has consistently upheld Oklahoma's great risk of death aggravator against similar constitutional challenges.  See Turrentine v. Mullin, 390 F.3d 1181, 1199 (10th Cir. 2004) (acknowledging Tenth Circuit precedent and denying an Eighth

Amendment challenge to the aggravator); Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999)

(citing Brecheen v. Reynolds, 41 F.3d 1343 (10th Cir. 1994)); Brecheen, 41 F.3d at 1360-61

(finding that the aggravator is "properly limited to a particular subclass" of murderers and

not unconstitutionally vague).  In light of this authority, Petitioner's argument also fails.

Relief is denied as to Petitioner's Ground Eight.

### 9.     Ground Nine:  Cumulative Error

In his ninth ground for relief, Petitioner argues the accumulated effect of errors

alleged in Grounds One through Eight rendered his trial fundamentally unfair.  (Pet. at 74-

77.)  Petitioner raised a claim of cumulative error on direct appeal and in his Application for

Post Conviction Relief.  The OCCA denied relief on direct appeal and post-conviction.

Stouffer, 2006 OK CR 46, ¶¶ 202-06, 147 P.3d at 280; Stouffer, Case No. PCD-2003-835,

slip. op. at 7.  Respondent argues the OCCA's determinations are not contrary to, nor an

unreasonable application of, clearly established federal law.  (Resp. at 44-47.)

Cumulative error may be present only "when the 'cumulative effect of two or more

individually harmless errors has the potential to prejudice a defendant to the same extent as

a single reversible error.'"  Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)

(quoting Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002) (internal quotation omitted)).

"'A cumulative-error analysis merely aggregates all the errors that individually have been

found to be harmless, and therefore not reversible, and it analyzes whether their cumulative

effect on the outcome of the trial is such that collectively they can no longer be determined

to be harmless.'"  Id. (quoting United States v. Rivera, 900 F.2d 1464, 1470 (10th Cir.

1990)).  In capital cases, the focused inquiry is "whether the errors 'so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case.'" Wilson v. Sirmon, 536 F.3d at 1122 (quoting Thornburg v. Mullin, 422 F.3d 1113, 1137 (10th Cir. 2005)).

Of the grounds Petitioner raised on direct appeal, the OCCA found three errors: (1) the prosecution was permitted to present evidence of a physical altercation between Petitioner and Bill McCormack during the first stage;[14] (2) some of the prosecutor's remarks during closing argument were irrelevant and were intended to illicit an emotional response (Ground Seven); and (3) the victim impact testimony included improper evidence (Ground Five). Stouffer, 2006 OK CR 46, ¶¶ 203-06, 147 P.3d at 280.  The OCCA concluded that the errors during first stage did not affect the outcome of the case, and when taken in conjunction with the second stage error, did not render his sentencing proceeding unfair. Id. On post-conviction review, the OCCA determined there was no additional error to consider in a cumulative error analysis, and denied relief. Stouffer, Case No. PCD-2003-835, slip. op. at 7-8.

In Ground Three, the Court determined that any error relating to jury tampering was harmless.  Petitioner's claim of cumulative error is therefore reviewed de novo as the OCCA could not have considered the aggregate prejudicial impact of the jury tampering claim. See

---

[14] Petitioner does not raise this claim in his Petition.

Malicoat v. Mullin, 426 F.3d 1241, 1263 (10th Cir. 2005); see also Welch v. Sirmons, 451

F.3d 675, 710 (10th Cir. 2006), abrogated on other grounds by Wackerly v. Workman, 580

F.3d 1171 (10th Cir. 2009) ("Because we have identified additional error, and because the

OCCA could not have considered the aggregate prejudicial impact of the individual errors,

we must review Mr. Welch's cumulative error claim de novo.").  After considering this error

along with his Grounds Five and Seven, the Court concludes the cumulative effect of the

errors did not infect the trial and sentencing proceedings with unfairness such that he was

denied due process of law.  The cumulative effect of the errors, when compared with the

evidence and testimony presented at trial, did not significantly strengthen the State's case or

diminish Petitioner's case.  No reasonable probability exists that the jury would have

rendered a different first or second stage verdict.  As a result, Petitioner's ninth ground for

relief is denied.

## V.    CONCLUSION

After a complete review of the transcripts, trial record, appellate record, record on

post-conviction, briefs filed by Petitioner and Respondent, and the applicable law, the Court

finds that Petitioner is not entitled to relief.

ACCORDINGLY, Petitioner's *Petition for a Writ of Habeas* (Dkt. No. 31) is

DENIED.  A judgment will enter accordingly.

IT IS SO ORDERED this 17th day of October, 2011.

ROBIN J. CAUTHRON
United States District Judge

54